## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| MAIRA ORTIZ, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 21-cv-2316-JAR-KGG |
| | ) | |
| BANK OF LABOR, | ) | |
| | ) | |
| Defendant. | ) | |

## PRETRIAL ORDER

An interim pretrial conference was conducted in this case on February 24, 2022, by U.S. Magistrate Judge Kenneth G. Gale. The plaintiff, Maira Ortiz ("Ortiz"), appeared through counsel, Alan Johnson.  The defendant, Bank of Labor ("Bank"), appeared through counsel, Julianne Story and Kat Pearlstone.

This pretrial order supersedes all pleadings and controls the subsequent course of this case.  It will not be modified except by consent of the parties and the court's approval, or by order of the court to prevent manifest injustice.  Fed. R. Civ. P. 16(d) & (e); D. Kan. Rule 16.2(b).

## 1.    PRELIMINARY MATTERS.

**a.    Subject-Matter Jurisdiction.**  Subject-matter jurisdiction is invoked under 28 U.S.C. § 1331 and is not disputed.

**b.    Personal Jurisdiction.**  The court's personal jurisdiction over the parties is not disputed.

1

    **c.**    **Venue.**  Venue in this court is not disputed.

    **d.**    **Governing Law.**  Subject to the court's determination of the law that applies to the case, the parties believe and agree that the substantive issues in this case are governed by the following law:

Plaintiff has alleged claims for sex discrimination under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, et seq. and a claim for discrimination based on her alleged disability of pregnancy under the Americans with Disabilities Act.  42 U.S.C. §12101.  Plaintiff's allegations call for the application of federal law.

**2.**    **STIPULATIONS.**

    **a.**    The following facts are stipulated:

1. Maira Ortiz is a Hispanic female.

2. Maira Ortiz was hired by Bank of Labor in May 2018 to fill a Universal Banker 1 Bilingual role.

3. As a Universal Banker 1, one of Maira Ortiz's job responsibilities was to count the cash in the Bank vault under the Bank's dual control process.

4. After counting the cash in the Bank vault under the Bank's dual control process, Maira Ortiz was then expected to sign off on the amount of cash in the Bank vault via the Bank vault log.

5. During her employment with Bank of Labor, Maira Ortiz was aware of the Bank's Teller Difference Guidelines, Code of Ethics and Bank Vault and Teller Cash Procedures and understood that she was expected to comply with these policies.

6. During her employment with Bank of Labor, Maira Ortiz knew that force balancing the vault log was prohibited by Bank policy, and specifically, that force balancing the vault log violated the Bank's Teller Difference Guidelines, Code of Ethics and Bank Vault and Teller Cash Procedures.

2

7. For the relevant time period, Maira Ortiz worked at Bank of Labor's Shawnee Drive location.

8. On November 1, 2019, Branch Supervisor Charlotte Hayes and Maira Ortiz were working a shift together at the Shawnee Drive Branch.

9. During the November 1, 2019 shift, Branch Supervisor Charlotte Hates purchased $25.00 in pennies from the Bank vault from her drawer.

10. On November 1, 2019, Maira Ortiz counted the cash in the vault with a co-worker.

11. On November 1, 2019, when Maira Ortiz went to sign off on the amount of cash in the vault, there was a $25.00 cash difference in the amount in the vault and the amount listed on the vault log.

12. After identifying the cash difference, Maia Ortiz whited-out the original cash amount on the vault log and entered another number which was $25.00 less than the original amount.

13. Maira Ortiz's employment with the Bank was terminated effective November 18, 2019.

14. The Bank explained to Maira Ortiz that the decision to terminate her employment was because she force balanced the vault and falsified the vault log in violation of the Bank's Teller Difference Guidelines, Code of Ethics and Bank Vault and Teller Cash Procedures.

15. The only disability Maira Ortiz is alleging to have had during her employment with the Bank is that she was pregnant.

16. At the time her employment ended, Ortiz earned $17.74 per hour.

17. Following the termination of her employment with the Bank, Maira Ortiz's first effort to find subsequent employment occurred when she posted her resume on Indeed toward the end of 2020. In response to her resume, 5 banking institutions contacted Ortiz to see if she was interested in open positions. Ortiz did not respond to these employment inquiries.

18. In January 2021, Ortiz applied for a position with Loomis and received a verbal offer at an hourly rate of $14.00 an hour.  Ortiz rejected the offer of employment.

19. In Fall 2021, Ortiz was offered employment with Quest Diagnostics at an hourly rate of $19.50.  Ortiz wanted to delay her start date so she could take a family vacation in December 2021.  Ortiz did not end up working for Quest Diagnostics.

20. On December 15, 2021, Ortiz was offered employment with Wyandotte County, Kansas.  Ortiz began working for Wyandotte County on January 20, 2022 at an hourly rate of $19.40.

**b.**   The parties have stipulated to the admissibility of the following exhibits for purposes of summary judgment and trial:

1.   The Bank's Teller Difference Guidelines

2.   The Bank's Code of Ethics

3.   The Bank's Vault and Teller Cash Procedures

4.   Maira Ortiz's November 1, 2019 Employee Disciplinary Report and the corresponding attachments.

**3.   FACTUAL CONTENTIONS.**

**a.   Contentions of Plaintiff.**

In the early fall of 2019, Ms. Ortiz advised her supervisors, Charlotte Hayes and Mary Moulin, that she was pregnant. Ms. Hayes was then the Bank Branch Supervisor and Ms. Moulin was the Bank Branch Manager. Also in the early fall of 2019, Ms. Ortiz asked Ms. Hayes for permission to use the bathroom in the McDonald's next door to the Branch facility, which was located in the same building as a gas station. Ms. Ortiz explained that because she was pregnant, she had to use the bathroom frequently, and the bathroom in the gas station was filthy. Ms. Hayes denied Ms. Ortiz's request to use the bathroom in the McDonald's next door.

Also in the early fall of 2019, Ms. Ortiz asked Ms. Hayes if she could continue using a chair while helping customers. Because of her pregnancy, Ms. Ortiz had previously been

4

using a chair while helping customers.  Ms. Hayes denied Ms. Ortiz's request. However, the tellers in the drive-through at the Branch facility continued to be allowed to use a chair while helping customers.

Ms. Ortiz's duties at the Branch included counting the cash in the vault.  Her shift ended at 3:45 p.m. On November 1, 2019, around 3:30 p.m., Ms. Ortiz counted the cash in the vault with another employee, and they both signed a vault log stating the amount of cash in the vault. When Ms. Ortiz went to enter the cash amount in the computer, there was a $25.00 discrepancy.  Ms. Ortiz then told the other employees, including Ms. Hayes, that there was a $25.00 discrepancy.  Ms. Ortiz then asked the other employees, including Ms. Hayes, if there were any missing cash tickets. The other employees, including Ms. Hayes, indicated that there were not any missing cash tickets. Ms. Ortiz then stated that she must have mistakenly miscounted the cash in the vault.

Because Ms. Ortiz believed that she had mistakenly miscounted the cash in the vault, she whited-out the original amount on the vault log, and entered another amount which was $25.00 less than the original amount.  Ms. Ortiz then left work at 3:45 p.m.

Around 5:00 p.m. on the same day, Ms. Hayes counted the cash in her drawer, and found that it had an overage of $25.00. There was an overage because Ms. Hayes had forgotten to fill out a cash ticket for $25.00 worth of pennies which she had taken from the vault earlier in the day. Consequently, she filled out a cash ticket for $25.00, and then gave the ticket to another employee, who was counting the cash in the vault at the end of the work day. With the cash ticket from Ms. Hayes, the cash in the vault balanced.

On November 18, 2019, Ms. Moulin informed Ms. Ortiz that she was being terminated from her employment for ostensibly violating policies, procedures, and guidelines of the Bank.  However, this explanation was pretextual because a motivating factor in the decision to terminate Ms. Ortiz's employment was a discriminatory animus based on her sex and pregnancy.  This discriminatory animus may be inferred from the circumstances surrounding Ms. Ortiz's termination, including (but not limited to) treating Ms. Hayes, a similarly situated, non-pregnant employee, in a more favorable manner; and by giving a false or incomprehensible explanation for Ms. Ortiz's termination.

As a result of the adverse actions taken by Ms. Hayes and Ms. Moulin against Ms. Ortiz she has suffered damages in the form of loss of past and future income and benefits, plus damages in the form of emotional distress, mental anguish, and loss of enjoyment of life. In taking adverse actions against Ms. Ortiz, Ms. Hayes and Ms. Moulin acted with malice or with reckless indifference to Ms. Ortiz's federally protected rights.

b.      **Contentions of Defendant.**

The Bank is a Kansas-based corporation originally founded as a labor community bank. Ortiz began her employment with the Bank in May 2018 as a universal banker/teller. Ortiz was covered by a collective bargaining agreement, and had access to the collective bargaining agreement's grievance procedure. Further, upon the commencement of her employment with the Bank, Ortiz read, received, and understood the Bank's anti-discrimination and harassment policy, and procedures for requesting a reasonable accommodation related to a claimed disability. Ortiz further understood that the Bank's anti-discrimination policy also included protections against retaliation for employees who report discrimination.

Ortiz received training regarding the Bank's vault balancing and dual control procedures – which are put into place to ensure the Bank has an accurate count of cash located within the vaults and teller drawers within its branches. This is an essential function for the Bank to safeguard against theft and embezzlement, and to keep an appropriate accounting of cash on hand. Included in this training were specific guidelines associated with how universal bankers/tellers were to handle counting differences associated with cash in the vault or teller drawers. The training informed employees that "force balancing," the act of altering or fabricating numbers on a cash count log to achieve an accounting balance (such as writing down a teller drawer contains $100 dollars in case when it only contains $97 dollars), was strictly prohibited. Specifically, Ortiz was instructed that force balancing to ensure the vault count coincided with records demonstrating withdrawals and deposits from teller drawers was a terminable offense.

In her role as a universal banker/teller at the Bank's Shawnee Drive branch, Ortiz – along with other universal bankers/tellers – was provided with the responsibility of counting the cash in the vault and balancing that amount with the noted cash transactions from the branch throughout the day, including customer cash withdrawals and deposits. The counting of the vault typically occurs three times per day – upon opening, during shift change, and at close.

In addition to the lobby where customers can receive in-person assistance, the Shawnee Drive branch offers drive through services. The drive through windows have chairs available for the employees assigned to the drive through. Other than the drive through chairs, employees at the Shawnee Branch were expected to stand at their desks/teller stations. If an employee needed to sit, they were able to use the drive through chairs. This policy applied equally to all employees, including Ortiz.

As a security measure, the Bank requires two (2) employees to be present at any Bank branch building while the branch is open. While working at the Shawnee Drive

branch, Ortiz served as an opener, meaning she and another co-worker would be the first to arrive to open the Shawnee Branch drive through. Additional co-workers would arrive later in the day when the Bank lobby opened at 9:00 am. The Shawnee Drive branch shares a building and bathroom with a 7/11. Employees are able to access the bathroom in the 7/11 at any time. However, employees at the Shawnee Drive branch prefer using the bathroom at the McDonalds across the street because they believe it is cleaner. Employees are allowed to use the McDonalds bathroom at their discretion, except when only 2 employees are working at the branch. When only two employees are working, they must either use the 7/11 bathroom or wait until a third employee arrives to ensure compliance with the Bank's security measures. This policy applied equally to all employees, including Ortiz.

Ortiz understood that the Bank had an anti-discrimination policy, which included a procedure for requesting a reasonable accommodation. Ortiz did not request an accommodation at any time during her employment with the Bank.

On November 1, 2019, Branch Supervisor Charlotte Hayes, a Hispanic female, purchased $25.00 in pennies from the Bank vault for her drawer. When Ms. Hayes completed this transaction, she mistakenly forgot to issue a ticket documenting the purchase. Forgetting to issue a ticket is a procedural error that occasionally occurs – employees are not terminated for forgetting to write a ticket. Later that day, while performing a dual control vault count with another employee, Ortiz noticed that the vault log illustrated a $25.00 discrepancy, caused by Ms. Hayes' earlier mistake. After identifying and recording the discrepancy in the vault log, Ortiz did not recount the vault as required, nor did she notify a member of management that the vault was out of balance. Rather, Ortiz unilaterally and intentionally used whiteout to eliminate the discrepancy, and force balanced the vault log. It is uncontroverted that Ortiz altered the vault count log. It is also uncontroverted that Ortiz knew force balancing was prohibited and that it was a terminable offense.

After this force balancing, Ortiz did not inform her co-workers, supervisor, or the branch manager that the vault count was not accurate. Nor did Ortiz inform the other employee who performed the count with her that she had altered the vault count log. The discrepancy was discovered by Ms. Hayes at the end of her shift, when Ms. Hayes realized that she had forgotten to write a ticket and went to remedy the mistake. Ms. Hayes subsequently notified her supervisors of her error and the document falsified by Ortiz.

Based on Ortiz's intentional falsification of documentation and unethical conduct, the decision was made to terminate her employment effective November 18, 2019. This decision to terminate Ortiz's employment was legitimate and non-discriminatory and was made in good faith based on reasonable business judgment and without regard to Ortiz's

sex, and/or alleged disability of pregnancy.  At no point during her employment did Ortiz request an accommodation for any alleged disability.  Further Ortiz did not raise any internal complaints for any alleged discrimination, nor did she utilize the grievance procedure outlined in the applicable collective bargaining agreement.  Because Ortiz unreasonably failed to avail herself to the measures implemented by the Bank to prevent and/or correct discrimination, the Bank cannot be held liable for any alleged discrimination, the existence of which the Bank denies.

At the time her employment ended, Ortiz earned $17.74 per hour.  Following the end of her employment with the Bank, Ortiz failed to make reasonable efforts to mitigate her damages.  Ortiz applied for unemployment benefits and received $25,336.00 dollars in unemployment compensation in 2020.  In light of the birth of her second child in January 2020 and the COVID-19 pandemic, Ortiz made the decision not to seek subsequent employment until late 2020.  After posting her resume on Indeed in late 2020, multiple potential employers, including 5 banking entities, reached out to Ortiz to see if she would be interested in filling vacant positions.  Ortiz chose not to respond to these offers.  Ortiz also declined an offer of employment in January 2021, in which she would have made $14.00 an hour.  Ortiz further declined another job offer in fall 2021 in which she was offered $19.50 an hour.  Ortiz finally accepted an offer for subsequent employment starting in January 2022.  In this role, Ortiz earns $19.40 an hour.  Ortiz also earned $700.00 a month from a rental property which she manages with her husband.  To the extent Ortiz has earned income following the termination of her employment with the Bank, the Bank is entitled to a set off for said mitigating income and benefits.  Because Ortiz chose not to seek subsequent employment for reasons wholly unrelated to her employment with the Bank, any injury Ortiz suffered due to a lack of employment was not proximately caused by the Bank and the Bank should not be held liable for such conduct. Further, the Bank is entitled to a set off for amounts earned or which could have been earned through Ortiz's reasonable efforts.

## 4.    LEGAL CLAIMS AND DEFENSES.

### a.    Legal Claims of Plaintiff(s).

Ms. Ortiz asserts that she is entitled to recover upon the following alternative theories:

### 1.  Disability Discrimination In Violation of the ADA (Count I)

Ms. Ortiz contends that in the fall of 2019, she was a qualified individual with a disability (pregnancy), and that she was protected by the ADA. Ms. Ortiz further contends she requested two reasonable accommodations for her disability, namely, permission to

use the bathroom in the McDonald's next door; and permission to continue using a chair while helping customers. Ms. Ortiz further contends that her reasonable requests for accommodations for her disability were denied by Ms. Hayes, and that these denials violated the ADA.

Ms. Ortiz further contends that the violations of the ADA by Ms. Hayes caused Ms. Ortiz to suffer damages in the form of emotional distress, mental anguish, and loss of enjoyment of life.  Ms. Ortiz further contends that Ms. Hayes acted with malice or with reckless indifference to Ms. Ortiz's federally protected rights, and therefore the Bank is liable for punitive damages. Ms. Ortiz further contends that she is entitled to an award of reasonable attorney fees pursuant to 42 U.S.C. § 12205.

### 2.  Sex Discrimination in Violation of Title VII (Count II)

Ms. Ortiz contends that the Bank discriminated against her by taking adverse actions against her based on her sex and pregnancy. Specifically, Ms. Ortiz contends that Ms. Hayes and Ms. Moulin discriminated against her in the following ways: by refusing to allow her to use the bathroom in the McDonald's next door; by refusing to allow her to continue to use a chair while helping customers; and by terminating her from her employment. Ms. Ortiz further contends that these adverse actions taken against her because of her sex and pregnancy violated Title VII.

Ms. Ortiz further contends that the violations of Title VII by Ms. Hayes and Ms. Moulin caused Ms. Ortiz to suffer damages in the form of loss of past income and benefits, as well as emotional distress, mental anguish and loss of enjoyment of life. Ms. Ortiz further contends that Ms. Hayes and Ms. Moulin acted with malice or with reckless indifference to Ms. Ortiz's federally protected rights, and therefore the Bank is liable for punitive damages.  Ms. Ortiz further contends that she is entitled to an award of reasonable attorney fees pursuant to 42 U.S.C. § 2000e-5(k).

### 3.  Ancestry/National Origin Discrimination in Violation of Title VII (Count III)

Ms. Ortiz withdraws her claim that the Bank discriminated against her based on her ancestry/national origin.

### b.     Defenses of Defendant(s).

Defendant Bank of Labor asserts the following defenses both affirmative and in the way of denials:

1.      Plaintiff's Complaint fails in whole or in part to state a claim upon which relief can be granted against Defendant.

2.      Plaintiff's claims are barred in whole or in part by the doctrines of estoppel, laches, waiver, and/or unclean hands.

3.      Plaintiff's damages, the existence of which damages Defendant specifically denies are barred or reduced, in whole or in part, by her failure to mitigate her damages.

4.      Plaintiff's damages, the existence of which damages Defendant specifically denies, were caused by Plaintiff's own conduct.

5.      Upon information and belief, Plaintiff, in whole or in part, has failed to mitigate her damages.  Additionally, Defendant is entitled to an offset for any mitigating income and benefits received by Plaintiff.

6.      Plaintiff cannot establish a *prima facie* case of intentional, unlawful discrimination based on sex, including but not limited to that she cannot show her sex was a motivating factor in any adverse employment decision by Defendant.

7.      Plaintiff cannot establish a *prima facie* case of intentional, unlawful discrimination based on national origin, including but not limited to that she cannot show her national origin was a motivating factor in any adverse employment decision by Defendant.

8.      Plaintiff cannot establish a *prima facie* case of intentional, unlawful discrimination based on disability, including but not limited to that she cannot show she had a disability within the meaning of applicable law or that she was a qualified individual

with a disability or that her alleged disability was a motivating factor in any adverse employment decision by Defendant.

9.      Defendant's actions with respect to Plaintiff were non-discriminatory, non-harassing and non-pretextual; were based on legitimate reasons and carried out in the good faith exercise of Defendant's reasonable business judgment; were not based on Plaintiff's sex, alleged disability, and/or national origin; and were carried out/would have been carried out regardless of any protected status.

10.     Defendant is not liable for any alleged discrimination, the existence of which Defendant denies, because Defendant promulgated and disseminated appropriate company policies prohibiting discrimination and had measures in place to prevent and/or correct discrimination and Plaintiff failed to avail herself of such measures.

11.     Plaintiff is not entitled to recover any liquidated, exemplary, or punitive damages, the existence of which damages Defendant specifically denies, because Plaintiff has not set forth and cannot set forth facts sufficient to support a claim under any law for such damages, because Defendant adopted policies and practices in support of its non-discrimination/anti-harassment obligations and in good faith attempted to comply with those obligations, and because any employee(s) of Defendant who engaged in the conduct alleged, the existence of which conduct Defendant specifically denies, lacked sufficient authority to subject Defendant to punitive damages.

12.     Any prayer by Plaintiff for punitive damages violates the 8th and 14th Amendments to the United States Constitution.

13.     Defendant denies any of its employees or agents acting within the course and scope of their employment with it caused any harm, injury, or damage to Plaintiff.

14.     Any injury to Plaintiff, the existence of which Defendant specifically denies, was not proximately caused by Defendant and was caused by Plaintiff and/or by third parties over whom Defendant had no control or who were acting outside the course and scope of their employment with Defendant, and who were not acting in furtherance of Defendant's business.  Consequently, Defendant is not liable for the alleged conduct.

15.     Any alleged harm Plaintiff suffered, the existence of which harm Defendant specifically denies, was not reasonably foreseeable.

## 5.     DAMAGES AND NON-MONETARY RELIEF REQUESTED.

If Plaintiff prevails:

a.     Loss of past compensation and benefits:  $100,000.00.

b.     Past and future noneconomic loss:  $300,000.00.

c.     Punitive damages:  $300,000.00.

d.     Attorney fees and litigation expenses:  unliquidated.

e.     Prejudgment interest at 10% per year:  unliquidated.

If Defendant prevails, it will seek reasonable attorneys' fees and costs.

## 6.     AMENDMENTS TO PLEADINGS.

None.

## 7.     DISCOVERY.

Under the scheduling order and any amendments, all discovery was to have been completed by February 24, 2022.  During depositions, it was discovered that Plaintiff had not disclosed pertinent information related to her mitigation efforts and sources of income, which required Plaintiff to supplement her discovery responses.  Discovery was ultimately completed on March 4, 2022.

Unopposed discovery may continue after the deadline for completion of discovery so long as it does not delay the briefing of or ruling on dispositive motions or other pretrial preparations.  Although discovery may be conducted beyond the deadline for completion of discovery if all parties are in agreement to do so, under these circumstances the court will not be available to resolve any disputes that arise during the course of such extended discovery.

8.    **MOTIONS.**

    a.    **Pending Motions.**

        There are presently no pending motions.

    b.    **Additional Pretrial Motions.**

After the pretrial conference, the parties intend to file the following motions:

Plaintiff: None. Defendant: Defendant anticipates filing a motion for summary judgment.  Defendant  further expects to file motions in limine along with other proper pretrial motions, if the motion for summary judgment is not granted.

The dispositive-motion deadline, as established in the scheduling order and any amendments, is **March 18, 2022**.

The parties should follow the summary-judgment guidelines available on the court's website:

http://ksd.uscourts.gov/wp-content/uploads/2015/10/Summary-Judgment-Guidelines.pdf

Consistent with the scheduling order filed earlier in this case, the arguments and authorities section of briefs or memoranda must not exceed 30 pages, absent an order of the court.

**c.**    **Motions Regarding Expert Testimony.**  Not applicable, i.e., the parties have stipulated that no expert testimony will be used in this case (or the parties have stipulated that no motions will be filed challenging the propriety of expert testimony in this case).

**9.**    **TRIAL.**

The trial docket setting, as established in the scheduling order and any amendments, is **November 15, 2022, at 9:00 a.m., in Kansas City, Kansas.**  This case will be tried by jury.  Trial is expected to take approximately 3-5 days.  The court will attempt to decide any timely filed dispositive motions approximately 60 days before trial.  If no dispositive motions are timely filed, or if the case remains at issue after timely dispositive motions have been decided, then the trial judge may enter an order or convene another pretrial conference to set deadlines for filing final witness and exhibit disclosures, exchanging and marking trial exhibits, designating deposition testimony for presentation at trial, motions in limine, proposed instructions in jury trials, and proposed findings of fact and conclusions of law in bench trials.

IT IS SO ORDERED.

Dated March 11, 2022, at Wichita, Kansas.

/S KENNETH G. GALE

Kenneth G. Gale
United States Magistrate Judge

15