IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| MAIRA ORTIZ,<br><br>　　　　Plaintiff,<br><br>　　v.<br><br>BANK OF LABOR,<br><br>　　　　Defendant. | Case No. 21-2316-JAR-KGG |

**MEMORANDUM AND ORDER**

Plaintiff Maira Ortiz filed suit against her former employer, Defendant Bank of Labor, alleging discrimination claims under the Americans with Disabilities Act ("ADA") and Title VII of the Civil Rights Act of 1964. Before the Court is Defendant's Motion for Summary Judgment (Doc. 24) and Plaintiff's Motion for Leave to File Surreply (Doc. 31). The motions are fully briefed, and the Court is prepared to rule. The Court grants Plaintiff's motion for leave to file a surreply and considered that proposed filing in ruling on the summary judgment motion. For the reasons set forth in detail below, the Court grants summary judgment in favor of Defendant.

**I.     Legal Standard**

Summary judgment is appropriate if the moving party demonstrates that there is no genuine dispute as to any material fact and that it is entitled to judgment as a matter of law.[1] In applying this standard, the court views the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party.[2] "There is no genuine issue of material fact unless the evidence, construed in the light most favorable to the nonmoving party, is such that a

---

[1] Fed. R. Civ. P. 56(a); *see also Grynberg v. Total*, 538 F.3d 1336, 1346 (10th Cir. 2008).

[2] *City of Herriman v. Bell*, 590 F.3d 1176, 1181 (10th Cir. 2010).

reasonable jury could return a verdict for the non-moving party."[3] A fact is "material" if, under the applicable substantive law, it is "essential to the proper disposition of the claim."[4] An issue of fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the non-moving party."[5]

The moving party initially must show the absence of a genuine issue of material fact and entitlement to judgment as a matter of law.[6] Once the movant has met this initial burden, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial."[7] The nonmoving party may not simply rest upon its pleadings to satisfy its burden.[8] Rather, the nonmoving party must "set forth specific facts that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant."[9] To accomplish this, the facts "must be identified by reference to an affidavit, a deposition transcript[,] or a specific exhibit incorporated therein."[10] The non-moving party cannot avoid summary judgment by repeating conclusory opinions, allegations unsupported by specific facts, or speculation.[11]

---

[3] *Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004).

[4] *Wright ex rel. Trust Co. of Kan. v. Abbott Lab'ies, Inc.*, 259 F.3d 1226, 1231–32 (10th Cir. 2001) (citing *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998)).

[5] *Thomas v. Metro. Life Ins. Co.*, 631 F.3d 1153, 1160 (10th Cir. 2011) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

[6] *Spaulding v. United Transp. Union*, 279 F.3d 901, 904 (10th Cir. 2002) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986)).

[7] *Anderson*, 477 U.S. at 256.

[8] *Id.*

[9] *Mitchell v. City of Moore*, 218 F.3d 1190, 1197–98 (10th Cir. 2000) (quoting *Adler*, 144 F.3d at 671).

[10] *Adams v. Am. Guar. & Liab. Ins. Co.,* 233 F.3d 1242, 1246 (10th Cir. 2000).

[11] *Argo v. Blue Cross & Blue Shield of Kan., Inc.*, 452 F.3d 1193, 1199 (10th Cir. 2006) (citation omitted).

Finally, summary judgment is not a "disfavored procedural shortcut"; on the contrary, it is an important procedure "designed 'to secure the just, speedy and inexpensive determination of every action.'"[12]

## II. Facts

The following facts are uncontroverted, stipulated to, or viewed in the light most favorable to Plaintiff as the nonmoving party.

Plaintiff Maira Ortiz is a Hispanic female. Defendant Bank of Labor ("Defendant" or "the bank") is a Kansas-based corporation originally founded as a labor community bank, which maintains branch locations throughout the State of Kansas and in the District of Columbia. Plaintiff was hired by Defendant in May 2018 to fill a Universal Banker 1 Bilingual role at the bank's Shawnee Drive location. The Shawnee Drive branch is a small location that shares a building and bathrooms with a 7-Eleven. Plaintiff's direct supervisor was Branch Supervisor Charlotte Hayes; her next level-supervisor was Branch Manager Mary Moulin.

### *Plaintiff's Access to Restrooms and Chairs*

There were two restrooms in the 7-Eleven. One was out of order and the other was always dirty. Therefore, Shawnee Drive branch bank employees generally used a restroom in the McDonald's located next door to the bank's building. In June 2019, Plaintiff learned that she was pregnant; she informed Hayes in September 2019, when she was about five months' pregnant. Prior to October 2019, Plaintiff was allowed to leave the Shawnee Drive branch when there were only two employees for the purpose of using the McDonald's restroom, located in a separate building next door. When Plaintiff returned from vacation in October 2019, Hayes told her she could no longer use the McDonald's restroom until Hayes or another teller began their

---

[12] *Celotex*, 477 U.S. at 327 (quoting Fed. R. Civ. P. 1).

shift because the bank required two people to be in the bank at any given time when it is open for security purposes. Plaintiff and another co-worker usually began their shifts at 7:15 a.m. Once Hayes arrived at 9:45 or 10:00 a.m., Plaintiff was able to use the McDonald's restroom because more than two employees were present.

After Plaintiff's October 2019 vacation, her feet started swelling at work, so she began sitting in a folding chair that fit inside her cubicle when she was not assisting a customer. Hayes took the chair away from Plaintiff three different times and told her that there had been a policy change and that if she wanted to use a chair, she needed to use one from the drive-through window area. Plaintiff could not carry the chairs from the drive-through window to her cubicle and the chairs at the drive through window did not fit into the teller window cubicle where Plaintiff worked. Hayes ignored Plaintiff when she tried to tell her that she could not carry the drive-through chairs and that they would not fit in her cubicle.

*Vault Balancing*

In support of its security measures, the bank implements and maintains policies related to vault security, including the Teller Difference Guidelines, the Bank Vault and Teller Cash Procedures, and the Code of Ethics (collectively, "Bank Policies"). For example, the Teller Difference Guidelines provide:

> DIFFERENCES
>
> All differences regardless of the amount will be recorded on the teller's over/short record. Teller differences of $1 or more will be counted. All cash differences must be reported to a directed supervisor or manager immediately. Teller differences of $50 or more also require a dual control audit to be completed . . . .
>
> . . . .
>
> DISMISSAL

4

> In addition to the Balancing Standards and Probation guidelines listed above, a teller may be terminated for any of the reasons listed below:
>
> - Force balancing of Bank Records, teller drawers, cash vaults, etc. in any way to avoid a cash difference. . . .[13]

A teller forgetting to write a ticket when cash is taken from the vault to fill their drawer is not listed as a terminable offense under the "Dismissal" section of the Teller Difference Guidelines. It is also not listed as an example of inappropriate conduct in the Code of Ethics that could lead to termination, although "[m]aking or causing false entries to the books or records of the Bank" is on the list of inappropriate conduct subject to discipline that could include termination.

The Bank Vault and Teller Cash Procedures provide the following guidance regarding vault cash balancing:

> - Every precaution is to be taken to avoid a situation that causes the cash vault to be out of balance. The use of dual control in every transaction that involves vault cash should help accomplish that goal. If a vault is found to be out of balance, the branch management team should follow the steps outlined in the Teller Difference Procedures. After balancing is complete, all tickets will be scanned with teller work.[14]

These procedures also address how tellers are to buy cash from the vault:

> - The teller will prepare a Cash In ticket for the amount of cash needed, recording the denomination and amount of currency/coin requested on the Cash In ticket.
> - The Vault Teller upon receiving the Cash In ticket will fill the cash order from the teller, utilizing that teller for the dual control process.
> - The Vault Teller will prepare the vault Cash Out ticket for the amount of the sale. The tickets will be initialed by both

---

[13] Doc. 25-3 at 1, 3.

[14] Doc. 25-4 at 5.

> parties and placed in the designated area for vault tickets
> until vault count and balancing is complete.[15]

In order to ensure that the bank has an accurate count of cash in its vaults and teller drawers, Defendant has vault-balancing and dual-control procedures. As part of the bank's dual-control procedures, at the beginning and end of each shift, two employees are expected to count the cash in the vault of each branch and confirm that the amount of cash listed in the vault matches the amount of cash recorded on the written vault log and on the bank's internal online banking system. One bank employee is required to call out the amount of cash in the vault and the second employee should document the amount on the written vault log. The vault log is then checked against the amount of cash listed in the bank's internal online banking system. If the amount of cash listed on the written vault log matches the amount listed on the bank's internal online banking system, the vault is balanced. When tellers take cash from the vault to fill their drawers, they are expected to write a ticket documenting the amount of cash withdrawn from the vault.

Plaintiff was aware of Defendant's Bank Policies, including those governing force balancing and how to handle cash differences, and understood that she was expected to comply with these policies. "Force balancing" is the act of modifying a bank record, such as a vault log or teller log, to avoid a cash difference. A "cash difference" occurs when the amount of cash in a drawer or vault does not match the amount recorded on the drawer or vault log. A cash difference can also occur when the amount of cash recorded on a vault log does not match the amount of cash recorded on the bank's online banking system. When a bank employee becomes

---

[15] *Id.* at 4.

6

aware of a cash difference while counting the vault, they are expected to notify their supervisor of the cash difference and recount the vault.

As a Universal Banker 1, one of Plaintiff's job responsibilities was to count the cash in the bank vault under the bank's dual-control process. After counting the cash in the vault under the dual-control process, Plaintiff was then expected to sign off on the amount of cash in the vault via the bank's vault log to confirm that it matched the amount of cash listed in the bank's internal online banking system.

On November 1, 2019, Plaintiff and Hayes were working a shift together at the Shawnee Drive branch. Hayes purchased $25.00 in pennies from the vault from her drawer but forgot to write a ticket. Plaintiff counted the cash in the vault with a co-worker at the end of her shift. Plaintiff found a $25.00 cash difference between the amount in the vault and the amount listed on the vault log. Plaintiff, who was standing about twenty feet away from Hayes' desk, asked if anybody had tickets from the vault. The only people who responded to her question were the tellers, who each said "no." Hayes looked up and Plaintiff stated that there was a $25 discrepancy. Hayes looked at Plaintiff but did not move from her desk or respond. After identifying the cash difference, Plaintiff whited-out the original cash amount on the vault log and entered another number which was $25.00 less than the original amount. She did not recount the vault. Plaintiff admitted during her deposition that her conduct amounted to modifying a bank record to balance the vault log, and that her failure to report the cash difference violated the Teller Difference Guidelines. Plaintiff understood that force balancing was a terminable offense.

Moulin learned of the vault balancing issue at the end of the day on November 1, 2019, after the bank closed for the day. Hayes reported to her that the vault was out of balance, that she had forgotten to make up a ticket from the vault, and that Plaintiff had force balanced the

vault. Hayes told Moulin that she made the ticket for the vault, and then balanced the vault and her drawer.

On the following Monday, November 4, 2019, Moulin met with Hayes and Plaintiff to discuss the vault balance incident from November 1. Hayes told Plaintiff that Hayes had made a mistake, so there was no money missing after all. Plaintiff stated that she did not intentionally force balance the vault, but she had "pregnancy brain" causing her to forget things. Hayes received a documented written warning for failing to write a ticket when she purchased pennies from the vault on November 1, 2019. Plaintiff testified that she was aware of other Shawnee Drive branch employees who forgot to write tickets in the past and were not terminated. She further testified that she was unaware of any non-pregnant employee who was not terminated after force balancing the vault.

Plaintiff continued to work for Defendant and was in charge of the vault until November 18, 2019, when Defendant terminated Plaintiff, effective on that date. Moulin, then-Senior Vice President/Retail Sales and Services Mary Buche, and Vice President and Director of Human Resources Vicki Carey made the decision to terminate Plaintiff. However, Moulin did not recommend termination. She recommended that Plaintiff receive a written warning like Hayes received. Defendant told Plaintiff that the decision to terminate her employment was because she force balanced the vault and falsified the vault log in violation of the Bank Policies.

### III.  Discission

Plaintiff brings two claims of discrimination tied to her pregnancy: (1) discrimination on the basis of sex under Title VII; and (2) disability discrimination under the ADA. Plaintiff identifies three discrete employment actions that give rise to both claims: (1) Defendant's refusal to allow her to use the McDonald's restroom during her pregnancy when there were two or less

employees on duty; (2) Defendant's refusal to allow her to use a chair during her pregnancy; and (3) her termination.

Because Plaintiff does not rely on direct evidence of discrimination, the Court considers her claims under the familiar burden-shifting analysis set forth in *McDonnell Douglas v. Green*.[16]  Under *McDonnell Douglas*, the plaintiff initially bears the burden of production to establish a prima facie case of discrimination.[17]  The burden of establishing the prima facie case is "not onerous."[18]  If plaintiff establishes a prima facie case, the burden shifts to defendant to articulate a facially nondiscriminatory reason for its actions.[19]  If defendant articulates a legitimate nondiscriminatory reason, the burden shifts back to plaintiff to present evidence from which a jury might conclude that defendant's proffered reason is pretextual, that is, "unworthy of belief."[20]

The Court considers Plaintiff's ADA and Title VII discrimination claims under this framework below.[21]  The Court first addresses the disability discrimination claim and the claims regarding Defendant's decision to deny Plaintiff the use of a chair and the use of her preferred restroom when there were only two employees at her bank branch and finds that Plaintiff has no evidence to support a prima facie case on these claims.  The Court assumes without deciding that

---

[16] 411 U.S. 792 (1973); s*ee Lincoln v. BNSF Ry. Co.*, 900 F.3d 1166, 1192 (10th Cir. 2018).

[17] 411 U.S. at 802.

[18] *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981).

[19] *Id.*; *Timmerman v. U.S. Bank, N.A.*, 483 F.3d 1106, 1113 (10th Cir. 2007).

[20] *Beaird v. Seagate Tech., Inc.*, 145 F.3d 1159, 1165 (10th Cir. 1998) (quoting *Randle v. City of Aurora*, 69 F.3d 441, 451 (10th Cir. 1995)).

[21] Despite couching her requests for a chair and use of a specific restroom as requests for reasonable accommodations, the Pretrial Order otherwise makes clear that Plaintiff's ADA claim is for discrimination.  Doc. 23 at 8–9.  She does not assert a separate claim for reasonable accommodation that would trigger a modified *McDonnell Douglas* analysis.  *See Lincoln v. BNSF Ry. Co.*, 900 F.3d 1166, 1204 (10th Cir. 2018).  Plaintiff's response brief is consistent with the Pretrial Order, describing her claims as sex discrimination under Title VII, and disability discrimination under the ADA.  Doc. 28 at 11.  Thus, the Court does not consider Plaintiff's ADA claims under the modified *McDonnell Douglas* framework addressed in Defendant's opening brief.

Plaintiff can establish a prima facie case of sex discrimination under Title VII regarding her termination. However, the Court grants Defendant's motion for summary judgment because there is no genuine issue of material fact that Defendant's proffered non-discriminatory reason for the termination is unworthy of belief.

### A. Prima Facie Case

To establish a prima facie case of disability discrimination under the ADA, a plaintiff must show that she "(1) is a disabled person as defined by the ADA; (2) is qualified, with or without reasonable accommodation, to perform the essential functions of the job held or desired; and (3) suffered discrimination by an employer or prospective employer because of that disability."[22] "In order to demonstrate 'discrimination,' a plaintiff generally must show that [she] has suffered an 'adverse employment action' because of the disability."[23]

To set forth a prima facie case of discrimination under Title VII, a plaintiff must establish (1) membership in protected class; (2) an adverse employment action; and (3) the adverse employment action occurred under circumstances giving rise to an inference of discrimination.[24]

Defendant argues that Plaintiff cannot meet her non-onerous burden of establishing a prima facie case of sex or disability discrimination. As for disability discrimination, Defendant urges that Plaintiff is not disabled under the ADA under established law in this district that holds pregnancy alone is not a disability under the statute. Defendant further argues that its decisions denying her the use of a chair while she was working and the use of the McDonald's restroom

---

[22] *EEOC v. C.R. England, Inc.*, 644 F.3d 1028, 1037−38 (10th Cir. 2011) (quoting *Justice v. Crown Cork & Seal Co., Inc.*, 527 F.3d 1080, 1086 (10th Cir. 2008)).

[23] *Id.* at 1038 (quoting *Mathews v. Denver Post*, 263 F.3d 1164, 1167 (10th Cir. 2001)) (collecting cases).

[24] *EEOC v. PVNF, L.L.C.*, 487 F.3d 790, 800 & n.5 (10th Cir. 2007) (discussing how elements of prima facie case in discrimination cases vary depending on context); *Bennett v. Windstream Commc'ns, Inc.*, 792 F.3d 1261, 1266 (10th Cir. 2015) (acknowledging that the Tenth Circuit has used different versions of the prima facie test, but stating that it has "express[ed] a preference for more concise formulations." (citations omitted)).

when there were two or less employees in the bank, are not adverse employment actions. Finally, Defendant argues that Plaintiff's termination did not occur under circumstances giving rise to an inference of discrimination. As described below, the Court agrees with Defendant that summary judgment is warranted on the disability discrimination claim because Plaintiff is not within the protected class, and on the chair and restroom claims because they do not constitute adverse employment actions. The Court assumes without deciding that Plaintiff can meet her non-onerous burden of demonstrating a prima facie case of sex discrimination based on her termination and proceeds to consider whether Defendant's stated nondiscriminatory reason for her discharge was a pretext for pregnancy discrimination, finding it was not.[25]

### 1. Disability Discrimination

Plaintiff asserts she is disabled under the ADA based on her pregnancy. Under the ADA, "[t]he term 'disability' means, with respect to an individual—(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such impairment; or (C) being regarded as having such an impairment."[26] The 2008 amendments to the ADA ("ADAAA") make establishing a disability easier for plaintiffs and were intended to ensure that "the definition of disability . . . [is] construed in favor of broad coverage."[27] "To constitute a disability under the ADAAA, plaintiff must show she was pregnant and had a related mental or physical impairment."[28] Plaintiff concedes that this is the

---

[25] Title VII prohibits discrimination on the basis of sex. 42 U.S.C. § 2000e-2(e)(1). The Pregnancy Discrimination Act amended the definition of "on the basis of sex" to include "pregnancy, childbirth, or related medical conditions; and women affected by pregnancy, childbirth, or related medical conditions shall be treated the same for all employment-related purposes." *Id.* § 2000e(k). Thus, there is no dispute that Plaintiff belongs to a protected class under Title VII.

[26] 42 U.S.C. § 12102(1).

[27] *Id.* § 12102(4)(A).

[28] *Shaw v. T-Mobile*, No. 18-2513-DDC-GEB, 2020 WL 5231309, at *12 (D. Kan. Sept. 2, 2020).

governing law in this district and that she cannot meet this standard. Instead, Plaintiff seeks to preserve the issue for appeal. Acknowledging Plaintiff's objection, the Court follows cases within this district that consistently conclude pregnancy alone, without a related mental or physical impairment, is insufficient to meet the definition of "disability" under the ADA and ADAAA.[29] Summary judgment is therefore granted on Plaintiff's disability discrimination claim.

### 2. Adverse Employment Action—Denial of a Chair and Access to McDonald's Restroom

As already discussed, Plaintiff must come forward with evidence of an adverse employment action to establish a prima facie case of discrimination under both statutes. Although the Tenth Circuit takes a broad view of what constitutes an adverse employment action, "mere inconvenience or an alteration of job responsibilities" does not qualify.[30] An adverse employment action with respect to a discrimination claim "constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits."[31] The liberal definition of "adverse employment action" includes "acts that carry 'a significant risk of humiliation, damage to reputation, and a concomitant harm to future employment prospects.'"[32] "[N]ot everything that makes an employee unhappy is an actionable adverse

---

[29] *See id.*; *Gudenkauf v. Stauffer Commc'ns, Inc.*, 922 F. Supp. 465, 472–74 (D. Kan. 1996); *Richards v. City of Topeka*, 934 F. Supp. 378, 382 (D. Kan. 1996), *aff'd,* 173 F.3d 1247 (10th Cir. 1999); *Wiseman v. Wal-Mart Stores, Inc.*, No. 08-1244-EFM, 2009 WL 10706901, at *4 (D. Kan. July 23, 2009).

[30] *Sanchez v. Denver Pub. Schs.*, 164 F.3d 527, 532 (10th Cir. 1998) (citations omitted).

[31] *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998) (collecting cases).

[32] *Annett v. Univ. of Kansas*, 371 F.3d 1233, 1239 (10th Cir. 2004) (quoting *Berry v. Stevinson Chevrolet*, 74 F.3d 980, 986 (10th Cir. 1996)).

action. Otherwise, minor and even trivial employment actions that an irritable, chip-on-the-shoulder employee did not like would form the basis of a discrimination suit."[33]

Defendant does not dispute that Plaintiff's termination is an adverse employment action, but challenges whether denying her the use of a chair and access to the McDonald's restroom when there are fewer than two employees on duty constitute adverse employment actions. Plaintiff responds that denying her the use of a chair and her preferred restroom created a significant risk of humiliation and physical discomfort to her. The Court agrees with Defendant that these two actions did not rise to the level of adverse employment actions and were instead mere inconveniences.

The uncontroverted facts establish that Plaintiff was not wholly denied the use of a chair while she was working. Hayes removed a folding chair from her cubicle, but told her she could use one of the chairs from the drive-through window—a policy that also applied to her co-workers. While the chair with which she was provided was heavy and did not fit well in her cubicle, such facts made it more of an inconvenience than an action that impacted a condition of employment. There is no evidence Plaintiff requested an accommodation with Human Resources, or that her doctor submitted a note on her behalf recommending she use a chair while working that Defendant ignored.

Likewise, Plaintiff was not denied access to a restroom during her pregnancy. To be sure, Plaintiff testified that the 7-Eleven restroom was dirty, but Plaintiff had access to that restroom until Hayes arrived for her shift later in the morning. She testified that she and another co-worker usually began their shifts at 7:15 a.m. and that once Hayes arrive at 9:45 or 10:00

---

[33] *Braxton v. Nortek Air Sols., LLC*, 769 F. App'x 600, 604 (10th Cir. 2019) (quoting *MacKenzie v. City & Cnty. of Denver*, 414 F.3d 1266, 1279 (10th Cir. 2005), *abrogated on other grounds by Lincoln v. BNSF Ry. Co.*, 900 F.3d 1166, 1185–86 (10th Cir. 2018)).

a.m., she was able to use the McDonald's restroom because more than two employees were present.

While Defendant's conduct may have risked Plaintiff's physical discomfort, evidence of humiliation alone is not sufficient to establish an adverse employment action.[34] Moreover, neither action had any impact on Plaintiff's prospect for future employment, a key factor in determining whether an action is sufficiently adverse.[35] Plaintiff does not explain how these actions effected the conditions of her employment, nor does she cite cases holding that analogous actions rise to the level of adverse employment actions. The Court is unable to locate authority supporting a finding that these are adverse employment actions.[36] Defendant's motion for summary judgment is therefore granted on both discrimination claims to the extent they are based on Defendant's refusal to allow Plaintiff to use a folding chair while working and its requirement that she not use the McDonald's restroom until more than two employees were present at the bank during operating hours.

---

[34] *Id.* at 605; *see Sanchez*, 164 F.3d at 532 n.6 (noting that in the case of a lateral transfer with no change to the conditions of employment, "the fact that the employee views the transfer either positively or negatively does not of itself render the denial or receipt of the transfer adverse employment action").

[35] *See Braxton*, 769 F. App'x at 605 (quoting *Hillig v. Rumsfeld*, 381 F.3d 1028, 1031 (10th Cir. 2004)).

[36] *See, e.g.*, *Evans v. Cap. Blue Cross*, No. 1:19-CV-497, 2021 WL 825764, at *11 (M.D. Pa. Mar. 4, 2021) (finding the defendant's replacement of a high-back chair with a low-back chair did not constitute adverse employment action); *Champagne v. Jacksonville State Univ.*, No. CV 08-RRA-1857-E, 2011 WL 13228313, at *13 (N.D. Ala. June 24, 2011) (finding allegations by plaintiff that she was without a computer and desk chair for a period of time did not constitute adverse employment actions); *Ryan v. O'Halloran Int'l, Inc.*, No. 4:03-CV-90531, 2004 WL 524431, at *1, *3 (S.D. Iowa Mar. 17, 2004) (finding removal of age discrimination plaintiffs' work station chairs that had been in place for years, requiring them to stand for eight hours per day despite younger employees being permitted to sit, in the face of letters from treating physicians supporting return of chairs, constituted adverse employment action); *Wilkes v. Nucor-Yamato Steel Co.*, No. 3:14-CV-00224-KGB, 2017 WL 4381684, *8 (E.D. Ark. Sept. 29, 2017) (finding no adverse employment action where there was no record evidence that lack of access to a particular restroom resulted in a material change to the plaintiff's employment status, such as a reduction in title, salary, or benefits); *Dauer v. Verizon Commc'ns Inc.*, No. 03 CIV. 05047 (PGG), 2009 WL 186199, at *3 n.3 (S.D.N.Y. Jan. 26, 2009) ("An employer's failure to provide clean, same-sex toilet facilities, standing alone, does not constitute an adverse employment action for purposes of establishing a prima facie case of discrimination."); *Gasperini v. Dominion Energy New England, Inc.*, No. CIV.A. 10-11246-JCB, 2012 WL 2402804, at *11 (D. Mass. June 25, 2012) ("[Plaintiff's] discomfort with the facilities, without more, does not constitute an adverse employment action.").

B.     **Legitimate Nondiscriminatory Reasons for Termination**

The Court has concluded that Plaintiff cannot set forth a prima facie case of disability discrimination, or sex discrimination based on Defendant's denial of the use of a folding chair and access to the neighboring McDonald's restroom; therefore, summary judgment is granted on those claims. The Court assumes without deciding that Plaintiff can establish a prima facie case on her remaining claim of sex discrimination based on her termination. Therefore, the burden of production shifts back to Defendant to articulate a facially nondiscriminatory reason for Plaintiff's termination. Defendant meets this burden by stating that it terminated Plaintiff for force balancing the vault on November 1, 2019, which is a terminable offense under Bank Policies.

C.     **Pretext**

The burden therefore shifts back to Plaintiff to demonstrate that Defendant's stated reason for her termination is a pretext for sex discrimination. Pretext evidence "may take a variety of forms."[37] Pretext may be shown by demonstrating "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence."[38] Pretext can also be demonstrated by "direct evidence that the proffered rationale is false, or that the plaintiff was treated differently from similarly-situated employees."[39]  "The critical question regarding this aspect of the *McDonnell Douglas* rubric is whether 'a reasonable factfinder could

---

[37] *Dewitt v. S.W. Bell Tele. Co.*, 845 F.3d 1299, 1307 (10th Cir. 2017) (citing *Kendrick v. Penske Transp. Servs.*, 220 F.3d 1220, 1230 (10th Cir. 2000)).

[38] *Argo v. Blue Cross & Blue Shield of Kan., Inc.*, 452 F.3d 1193, 1203 (10th Cir. 2006) (quoting *Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1323 (10th Cir. 1997)).

[39] *Crowe v. ADT Sec. Servs., Inc.*, 649 F.3d 1189, 1196 (10th Cir. 2011) (citing *Swackhammer v. Sprint/United Mgmt. Co.*, 493 F.3d 1160, 1167–68 (10th Cir. 2007)).

rationally find [the employer's rationale] unworthy of credence and hence infer that the employer did not act for the asserted nondiscriminatory reasons.'"[40]  The Court examines "the facts as they appear *to the person making the decision*."[41]

Plaintiff argues that Defendant's stated reason for her termination is unworthy of belief because there is evidence that Hayes, who was similarly situated, received preferential treatment when she violated Bank Policies by failing to write a cash ticket for the pennies she bought from the vault, causing the vault to be out of balance on November 1, 2019.  Plaintiff further contends that the force-balancing rationale is inconsistent, implausible, and false.  The Court addresses Plaintiff's pretext arguments below.[42]

### 1.   **Similarly-Situated Employees**

Pretext may be shown by evidence that Plaintiff "was treated differently from other similarly-situated employees who violated work rules of comparable seriousness."[43]  To be "similarly-situated," the employees must share the same decisionmaker, and be "disciplined for conduct of comparable seriousness."[44]  Plaintiff argues that she was treated less favorably than Hayes, despite them both violating Bank Policies on November 1, 2019.  It is uncontroverted that one of the three decisionmakers initially recommended that Plaintiff receive the same discipline as Hayes received for neglecting to fill out a cash ticket —a written warning—for force balancing the vault on November 1, 2019.

---

[40] *Lounds v. Lincare, Inc.*, 812 F.3d 1208, 1234 (10th Cir. 2015) (alteration in original) (quoting *Crowe*, 649 F.3d at 1196).

[41] *Zamora v. Elite Logistics, Inc.*, 478 F.3d 1160, 1166 (10th Cir. 2007) (en banc) (quoting *Watts v. City of Norman*, 270 F.3d 1288, 1295 (10th Cir. 2001)).

[42] Even if Plaintiff's disability discrimination claim based on termination survived the prima facie case inquiry, the result would be the same because she advances the same pretext arguments on both claims.

[43] *Smothers v. Solvay Chems., Inc*., 740 F.3d 530, 539 (10th Cir. 2014) (quoting *Kendrick v. Penske Transp. Servs., Inc*., 220 F.3d 1220, 1230 (10th Cir. 2000)).

[44] *Id.* at 540–41.

But Defendant argues that Hayes did not violate a comparably serious rule; thus, her preferential treatment is not probative of pretext. The Court agrees. When comparing rule violations, "the comparison need not be based on identical violations of identical work rules; the violations need only be of comparable seriousness."[45] Plaintiff's and Hayes' violations were comparable in the sense that they both contributed to the cash difference in the vault on November 1, 2019. But the uncontroverted facts establish that force balancing is a violation subject to dismissal under the Teller Difference Guidelines, but failing to write a ticket when cash is taken from the vault is not. In fact, Plaintiff testified that she was aware of employees other than Hayes who had forgotten to write tickets for cash from the vault and were not terminated. She was unaware of other non-pregnant employees who engaged in force balancing and were not terminated. Thus, it was both policy and practice at the bank to treat force balancing more seriously than failing to write a cash ticket. Therefore, the Court finds that Defendant's preferential treatment of Hayes, a non-pregnant employee, fails to demonstrate that Defendant's stated reason for Plaintiff's termination is unworthy of belief.

### 2. Inconsistencies, Incoherencies, and Contradictions

Next, Plaintiff argues that the force-balancing rationale is unworthy of belief because Defendant allowed her to continue working there until November 18, 2019. But Plaintiff fails to explain how the delay in her termination supports an inference of pretext. She suggests that if force balancing was a serious violation, it warranted immediate termination rather than a delayed decision. But this is pure speculation and fails to examine the facts as they appear to the persons making the termination decision. The delay between Plaintiff's infraction and her termination was not lengthy. The violation happened on November 1, 2019—a Friday. The following

---

[45] *Id.* at 541 (quoting *Elmore v. Capstan, Inc.*, 58 F.3d 525, 530 (10th Cir.1995)).

Monday, November 4, Moulin met with Hayes and Plaintiff to gather information about what happened the previous Friday. It took approximately two weeks from that date for the three decisionmakers to reach their termination decision, which is evidence that the decision was difficult, not implausible or inconsistent. Without more, the Court finds this evidence insufficient for a reasonable jury to infer that Defendant's stated reason for Plaintiff's termination is unworthy of belief.[46]

### 3. False Explanation

Finally, Plaintiff argues that Defendant's force-balancing rationale for Plaintiff's termination is false. Specifically, she compares Moulin's deposition testimony that force balancing is an intentional act, akin to theft, with Plaintiff's statement to Moulin and Hayes on November 4, 2019 that she did not intentionally force balance the vault. Plaintiff told them that she had "pregnancy brain" and could not remember things. Moreover, Plaintiff suggests that because no money was in fact missing from the vault, her force balancing should have been excused.

"To support an inference of pretext, . . . a plaintiff must produce evidence that the employer did more than get it wrong. He or she must come forward with evidence that the employer didn't really believe its proffered reasons for action and thus may have been pursuing a hidden discriminatory agenda."[47] Plaintiff's evidence falls short of this standard. The fact that Plaintiff may not have intentionally force balanced the vault does not excuse her violation of the Bank Policies, nor does it suggest that Defendant did not believe its reason for making the

---

[46] *See Riding v. Arup Lab'ies, Inc.*, No. 2:10-CV-01111-DN, 2013 WL 3049297, at *5 (D. Utah June 17, 2013) (finding delay between employee's alleged infraction and termination did not demonstrate pretext where there was neither a pattern of nor a lengthy delay).

[47] *Johnson v. Weld Cnty.*, 594 F.3d 1202, 1211 (10th Cir. 2010).

termination decision. Plaintiff admitted during the November 4 meeting that she force balanced the vault rather than re-counting it or expressly reporting the cash difference to her supervisor before leaving on November 1. Whether intentional or due to "pregnancy brain," her conduct was a terminable offense under Bank Policies, and there is no evidence to suggest that Defendant did not view it as the true reason for that decision.

In sum, Plaintiff cannot point to evidence in the summary judgment record that calls into question Defendant's proffered reason for its termination decision. Therefore, summary judgment is granted on her remaining claim of sex discrimination based on her termination. Because Plaintiff is unable to meet her summary judgment burden on the discrimination claims under the *McDonnell Douglas* burden-shifting framework, the Court need not consider Defendant's alternative basis for summary judgment on its mitigation of damages affirmative defense.

**IT IS THEREFORE ORDERED BY THE COURT** that Plaintiff's Motion for Leave to File Surreply (Doc. 31) is **granted**. Plaintiff shall file her proposed Surreply forthwith.

**IT IS FURTHER ORDERED BY THE COURT** that Defendant's Motion for Summary Judgment (Doc. 24) is **granted**.

**IT IS SO ORDERED.**

Dated: June 9, 2022

S/ Julie A. Robinson<br>
JULIE A. ROBINSON<br>
UNITED STATES DISTRICT JUDGE